UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

MICHELLE BOST, individually and on
behalf of all others similarly situated,

      Plaintiff,

v.

PROGRESSIVE PREMIER
INSURANCE COMPANY OF
ILLINOIS, an Ohio corporation,

      Defendant.

CIVIL ACTION
FILE NO.:

## CLASS ACTION COMPLAINT

Plaintiff Michelle Bost ("Plaintiff"), by and through undersigned counsel,

brings this class action, individually and on behalf of all others similarly situated,

against Progressive Premier Insurance Company of Illinois ("Progressive" or

"Defendant") and alleges as follows:

### INTRODUCTION

1.    This is a class action on behalf of Plaintiff and all other similarly

situated claimants in Georgia who received a payment for the loss of a totaled vehicle

from Defendant, where Defendant used valuation reports prepared by Mitchell

International, Inc. ("Mitchell") to determine the actual cash value ("ACV") of the

loss vehicles.  By using these valuation reports, Defendant systemically thumbs the

scale when calculating the ACV of claimants' loss vehicles by applying so-called

"Projected Sold Adjustments" that are: (a) arbitrary; (b) contrary to appraisal standards and methodologies; (c) not based in fact, as they are contrary to the used car industry's market pricing and inventory management practices; (d) not applied by the major competitor of Defendant's vendor Mitchell; and (e) on information and belief, not applied by Defendant and Mitchell to insureds in other states like California and Washington.

2.      In the event of a "total loss" to an insured vehicle—*i.e.*, where repair of the vehicle is impossible or uneconomical—Defendant's uniform insurance policies with Plaintiff and all putative members of the Class (defined below) promise to pay for the loss, limited to the ACV of the vehicle. Attached as Exhibit A is a copy of Plaintiff's Policy ("Policy"), which is materially identical to the policy for all members of the putative Class.

3.      When valuing total loss claims for vehicles, it is improper for an automobile insurance company, such as Progressive, to undervalue and underpay the claims by manipulating the data used to determine the ACV of the vehicles. Specifically, under its insurance policy terms and applicable Georgia law, Defendant has a duty to pay, and represents that it will pay, the ACV of a loss vehicle when adjusting total loss claims.

4.      Notwithstanding these obligations and representations, Defendant fails to fulfill its obligations by taking advantage of a valuation process that employs improper adjustments to reduce the value of comparable vehicles specified in the

valuation reports, in turn reducing the valuation of the total loss vehicles and the corresponding claim payment to the insured or claimant.

5.     Specifically, Defendant, through Mitchell, systemically applies a so-called "Projected Sold Adjustment" that results in a significant downward adjustment to the base values of the comparable vehicles used to calculate the ACV of Plaintiff's and Class members' total loss vehicles. This reduction is contrary to appraisal standards and methodologies and is not based in fact, as it is contrary to the used car industry's market pricing and inventory management practices. The adjustment is applied to each of the comparable vehicles on top of adjustments for differences such as mileage, options, and equipment. The only purported explanation for the downward adjustment appears on the last page of the valuation reports and is a general, nondescript statement claiming that the reduction is to "reflect consumer purchasing behavior (negotiating a different price than the listed price)." Exhibit B at p. 8.

6.     Neither Progressive nor Mitchell has ever conducted any study or research to determine whether such "consumer purchasing behavior" exists and impacts ACV in the modern used-car market. Worse than this complete lack of curiosity is that Defendant thumbs the scale by discarding vast amounts of relevant data that contradict applying a Projected Sold Adjustment. For example, until July 2021, Defendant, through its vendors, simply threw out all data where the list price equaled or exceeded the sold price. And to this day, Defendant persists in excluding

from Projected Sold calculations some data where the list price equaled sold price and all data where the sold price exceeds the list price, even though examples abound of dealerships that charge more than advertised price to customers purchasing a vehicle with cash—*i.e.* not providing the dealer the opportunity to profit through financing the sale or acquiring a trade-in—which is particularly relevant to the inquiry of determining a vehicle's actual ***cash*** value. Defendant fails to control for whether the vehicle was purchased with cash, or whether there were ancillary purchases or transactions that may influence the "sales price" but not the ACV (e.g., whether the customer traded in a vehicle at time of purchase, bought an extended warranty or service plan, or financed the purchase).

7.    Nevertheless, Progressive applies a Projected Sold Adjustment to the advertised (or listed) price of comparable vehicles when calculating the ACV of total-loss vehicles. For Plaintiff, the Projected Sold Adjustment was approximately 8.8% of each comparable vehicle's value prior to adjustments. To arrive at the Projected Sold Adjustment amount, however, Progressive, through third-party vendors, and as set forth above, categorically excludes transactions that undermine its flawed thesis: for example, transactions where the sold price exceeds list price, transactions from dealerships who market themselves as "no-haggle" dealerships, and every transaction where the sold price equaled the advertised price.

8.    As explained herein, the used auto market is such that, given the ubiquity of Internet advertising and shopping and developments in sophisticated

pricing software, car dealerships simply do not negotiate off of Internet advertised prices. Any difference between a list and sales price does not reflect a negotiation of the vehicle's *cash* value, but rather that a dealer shifted its profits to other components of the transaction: for example, profits made through financing or trade-in or ancillary products described above, or that the dealer applied a generally unavailable discount to the cash value of the vehicle (such as employee discount, loyalty discount, military discount, or friends/family discount). But Progressive ignores these market realities and is content with paying insureds and claimants below-market prices for their totaled vehicles.

9.    To arrive at its conclusion that consumers negotiate down the advertised price, Progressive, through its vendors, intentionally distorts the data, excludes transactions that undercut its false hypothesis, and ignores market realities, all for the purpose of applying a capricious and unjustified Projected Sold Adjustment so as to artificially deflate the value of total-loss vehicles.

10.    This pattern and practice of undervaluing comparable and total loss vehicles when paying automobile total loss claims through these arbitrary, unsupported, unjustified adjustments, which benefits the insurer at the expense of the insured, violates Defendant's policies with its insureds.

## PARTIES

11.    Plaintiff Michelle Bost, at all relevant times, was a Georgia citizen. At all relevant times, Plaintiff was contracted with Progressive for automobile

insurance. On or about August 10, 2017, Plaintiff was in a car wreck and Defendant deemed her vehicle to be a total loss.

12. Defendant Progressive Premier Insurance Company of Illinois is an Ohio company with its principal place of business in Ohio. Defendant provides insurance coverage throughout the United States for first-party property damage under collision and/or comprehensive coverage.

## JURISDICTION AND VENUE

13. Minimal diversity exists under the Class Action Fairness Act ("CAFA"), 28 U.S.C. §§ 1332(d), 1441(a)-(b), and 1453. Plaintiff and the proposed class members are citizens of the State of Georgia. Defendant is an Ohio Corporation that has its corporate headquarters in Ohio, and, at all relevant times hereto, Defendant was engaged in the business of marketing and selling insurance policies and adjusting insurance claims in the State of Georgia.

14. Plaintiff estimates that there are more than 100 putative class members, and the aggregate compensatory damages (in the amount of the Projected Sold Adjustment that were deceptively deducted), claimed by Plaintiff and the Class are estimated in good faith to exceed $5,000,000.00.

15. Venue is proper in this District under 28 U.S.C. § 1391, as a substantial portion of the conduct giving rise to Plaintiff's claims occurred in this District, and Defendant transacts business in this District.

## FACTUAL ALLEGATIONS

**Defendant's Systemic Application of Projected Sold Adjustments**

16.    On August 10, 2017, Plaintiff was involved in a car wreck and sustained physical damage to her vehicle. At the time of the car wreck, Plaintiff was contracted with Progressive.

17.    Like all members of the putative Class, Plaintiff made a property damage claim to Defendant.

18.    Pursuant to the same policies and procedures, Defendant declared Plaintiff's vehicle to be a total loss and purported to pay her the ACV of her loss vehicle, as it promised and represented it would under the uniform provisions of its insurance policies and Georgia law.

19.    When calculating its valuations and claims payments, Defendant systemically employs a routine "total loss settlement process." This process involves obtaining a "Vehicle Valuation Report" from Mitchell and relying upon the valuation provided by as the ACV amount owed under the policy. Defendant provided a Mitchell Vehicle Valuation Report for Plaintiff on August 17, 2017. *See* Exhibit B.

20.    The Mitchell Vehicle Valuation Reports used by Defendant during the relevant period followed the same process, provided and disclosed the same or substantially the same material information, and presented that material information in the same or substantially the same format. These valuation reports purport to

contain values for comparable vehicles recently sold or for sale in the claimant's geographic area. The reports also contain a purported valuation for the loss vehicle based upon advertisements for comparable vehicles listed in the report. The report then adjusts the advertised prices of those comparable vehicles to account for differences in equipment, mileage, and vehicle configuration. Exhibit B at p. 8.

21.    In addition, however, the valuation reports used by Defendant make a further adjustment to each loss vehicle called a "Projected Sold Adjustment." For Plaintiff, Projected Sold Adjustments in the amounts of -$884.00, -$751.00, and -$464.00 respectively, were applied to each of the three comparable vehicles. Exhibit B at pp. 5-7.

22.    Defendant provides no data specific to the comparable vehicles or any explanation of industry practices in its valuation reports to support *any* Projected Sold Adjustment, much less the specific downward adjustments used in Plaintiff's valuation reports. Instead, the *only* explanation is buried on the last page of each report, stating in full: "Projected Sold Adjustment – an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price)." Exhibit B at p. 8.

23.    In truth, Defendant's Projected Sold Adjustments do not reflect market realities (the context in which "consumer behavior" occurs) and run contrary to customary automobile dealer practices and inventory management, where list prices are priced to market to reflect the intense competition in the context of Internet

pricing and comparison shopping. Before the ubiquity of online advertising and shopping, "advertised" prices had very little to do with eliciting car buyers to particular dealerships—instead, car buyers generally went to their local used car dealership that had the desired vehicle in stock for sale. The "advertised" price was simply whatever price was listed on the physical window. And consumers could not, as they can now, easily compare that price to Internet advertisements of the same vehicle offered by competitors.

24.    As such, dealerships generally priced vehicles above market knowing that some consumers might be poor negotiators and they would realize an inflated profit on those sales. This above-market "window" price obviously allowed for negotiation, and a downward negotiation would often occur.

25.    But during the Class Period, that is simply no longer how the used car market operates. Now, given the need for Internet advertising, the prevalence of Internet shopping and consumer behavior, developments in sophisticated pricing software universally used by car dealerships, and the ease with which consumers can compare the advertised prices of identical vehicles across multiple competing dealerships, used car dealerships no longer price vehicles above market with room for—and the expectation of—negotiation. Instead, car dealerships use sophisticated pricing software—which provides the advertised prices of all competitors; the average "turn" of a given year, make and model; the amount for which vehicles have sold during a given time-period; etc.—and now appraise vehicles before acquiring

them to price them to market and do not negotiate from that price.

26.     This makes sense, because if a car dealership priced a vehicle above market with room for negotiation, consumers would simply not go to that dealership. This is because consumers can easily compare advertised prices, and, would seek out the vehicle priced to market, rather than the same vehicle priced at a higher amount (i.e., above market). And obviously, given the choice between paying less or paying more for an identical vehicle, consumers will choose to pay less.

27.     As such, a negotiated discount off the cash price is highly atypical and is not proper to include in determining ACV. The inclusion of this significant downward adjustment purportedly to "reflect consumer purchasing behavior" is particularly improper in the context of this action—insureds who have suffered a total loss of their vehicle and need to procure a replacement have limited time to search out the illusory opportunity to obtain the below-market deal Defendant assumes always exists without any explanation or support.

28.     Defendant's Projected Sold Adjustments are contrary to appraisal standards. There are multiple generally-recognized and acceptable methodologies for determining ACV, including use of comparable vehicles. Defendant begins the process of valuing loss vehicles using comparative methodology but improperly deviate from that process by thumbing the scales in against the insured. Defendant documents the loss vehicle's and each comparable vehicle's mileage, options, and trim, which are compared in the report, and makes dollar adjustments accordingly.

Plaintiff does not challenge these documented adjustments. At this stage of the process, however, Defendant abandons the comparative methodology and applies adjustments that are contrary to proper appraisal methodologies for determining ACV. Appraisers use advertised prices and only make adjustments based on observed and verifiable data; appraisal standards do not permit arbitrary adjustments from the advertised price based upon undocumented and unverifiable projections.

29.    Defendant thumbs the scale by discarding vast amounts of relevant data that contradict applying a Projected Sold Adjustment and by failing to control for material variables, including whether there were ancillary purchases or transactions that may influence what is recorded as the "sales price" but does not influence the ACV (e.g., whether the customer traded in a vehicle at time of purchase, bought an extended warranty or service plan, or financed the purchase).

30.    Until July 2021, Defendant excluded from the calculation of the Projected Sold Adjustment all transactions in which the list price of a vehicle equaled the sold price.

31.    Even after July 2021, Defendant still excludes some transactions in which the list price of a vehicle equals the sold price.

32.    Defendant has excluded and continues to exclude from the calculation of the Projected Sold Adjustment all transactions in which the sold price of a vehicle is greater than the list price.

33.    Without having performed any investigation or study, Defendant

simply assumes all such transactions are anomalies.

34.    Likewise, Defendant has not exercised even a modicum of curiosity to investigate whether market realities support the application of a Projected Sold Adjustment. Nor does Defendant or its vendors attempt to verify—even a single time—for those transactions where the advertised price exceeded sold price, whether the reason for the reduction was negotiation of the cash price of the vehicle and not some other (far more likely) reason, some of which are discussed herein.

35.    Neither Progressive's form Policy nor Georgia law permit reducing a vehicle's value for invented or arbitrarily assumed justifications.

36.    Moreover, the accuracy of Defendant's data is, at best, suspect, as it contains a significant number of transactions where the advertised date in the database comes *after* the sold date. As a matter of simply chronology, it makes no sense to advertise a vehicle after it is sold. But here, too, Defendant makes no effort to control for this obvious flaw in the data.

37.    These irremediable, and unjustifiable, errors, of course, skew the data in favor of Defendant to the detriment of the insureds.

38.    Moreover, examples abound demonstrating the glaring error of Defendant's cherry-picking practices.

39.    For example, related to the exclusion of sales prices greater than list prices, all advertised prices for comparable vehicles listed in Defendant's valuation reports are scraped from Internet sources—specifically Cars.com, Autotrader.com,

Vast.com, and TrueCar.com.

40.    The advertised prices many dealerships publish on these websites include discounts for consumers who are financing and providing a trade-in. Thus, a consumer who was not financing the vehicle through the dealership or who was not trading in a vehicle—obviously, insureds who sustained a total loss almost certainly are not trading a vehicle when purchasing a replacement vehicle—would have to pay in cash *more* than the price listed on sources where Mitchell scrapes advertisements for comparable vehicles. In determining the actual ***cash*** value of Plaintiff's and class members' totaled vehicles, there is no justification for Defendant to have excluded those transactions from calculating the Projected Sold Adjustment, while only including transactions where the sold price was recorded as less than the list price.

41.    Simply put, there is no justification for Progressive to exclude such transactions as outliers or mistakes when justifying how it calculates the amount of the so-called Projected Sold Adjustment.

42.    Doing so serves only to skew the data to meet Defendant's unjustified, unsupported, and uninvestigated assumption that the list price of comparable vehicles should always be reduced to pay insureds and claimants less.

43.    Defendant further fails to control whether the vehicle was purchased with discounts unavailable to the public (e.g., employee discounts).

44.    Defendant also fails to control for whether the vehicle was purchased

with cash, or whether there were ancillary purchases or transactions that may influence the recorded "sales price" but not the ACV (e.g., whether the customer traded in a vehicle at the time of purchase, bought an extended warranty or service plan, or financed the purchase).

45.    In these instances, the ACV of the vehicle remains its price to market; the dealership simply transferred the anticipated profit through either the sale of an optional ancillary product or by reducing what it would have offered in trade-in value.

46.    The impropriety and arbitrariness of Defendant's Projected Sold Adjustments are further demonstrated by the fact that Mitchell's primary competitor in providing valuation reports to insurance companies—CCC Intelligent Solutions, Inc.—does not apply projected sold adjustments in this manner. Instead, CCC Intelligent Solutions uses list prices.

47.    On information and belief, the impropriety and arbitrariness of Defendant's Projected Sold Adjustments are further demonstrated by the fact that Progressive Group entities do not apply these adjustments when valuing total losses in California or Washington. There is no justification for applying these adjustments when valuing total losses in Georgia while not subjecting California and Washington claimants to the same negative adjustments.

48.    Plaintiff and each member of the proposed Class were damaged by Defendant's application of these Projected Sold Adjustments because they were not

paid the ACV they would have received had Defendant applied proper methodologies and appraisal standards.

49.    Were it not for this improper adjustment, the "Base Value" in each valuation report would have been higher, resulting in a higher "settlement value" and in turn a higher payment by Defendant for ACV. Specifically, for Plaintiff, were it not for this improper adjustment, the payment of ACV by Defendant would have been $699.67 higher, before adding the related increase in payments for applicable sales taxes.[1]

## CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action individually and as a class action under Fed. R. Civ. P 23(a) and (b), on behalf of the following proposed Class:

> All Georgia citizens insured by Defendant who, from the earliest allowable time through the date an Order granting class certification is entered, received compensation for the total loss of a covered vehicle, where that compensation was based on a valuation report prepared by Mitchell and the ACV was decreased based upon Projected Sold Adjustments to the comparable vehicles used to determine ACV.

51.    Excluded from the Class are Defendant and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; governmental entities; and the Judge(s) and Court staff assigned to this case and their immediate family members.

---

[1] The dollar amount of Defendant's underpayment to Plaintiff was calculated as the difference in the "Base Value" without application of the improper Projected Sold Adjustments and the "Base Value" as calculated by Mitchell.

52.    Plaintiff reserves her right to amend the Class definition if discovery and further investigation reveal that any Class should be expanded or narrowed, divided into additional subclasses, or modified in any other way.

53.    **Numerosity.** The members of the Class are so numerous that individual joinder of all members of the Class is impracticable. While Plaintiff is informed and believes that there are thousands of members in the Class, the precise number is unknown to Plaintiff but may be ascertained from Defendant's books and records. Members of the Class may be notified of the pendency of this action by recognized Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

54.    **Commonality and Predominance.** This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.    Whether Defendant systemically used Mitchell's Vehicle Valuation Reports in adjusting total loss claims to determine ACV;

b.    Whether the Mitchell Vehicle Valuation Reports included Projected Sold Adjustments to the value of the comparable vehicles that reduced the base value, and thus the claim amount paid by Defendant for the ACV of Plaintiff's and members of the Class total loss vehicles;

c.    Whether Defendant's improper practices injured Plaintiff and members of the Class;

    d.   Whether Defendant's acts violated its obligations under the policy of insurance;

    e.   Whether Plaintiff and the Class are entitled to compensatory damages, and if so, the calculation of damages; and

    f.   Whether Plaintiff and members of the Class are entitled to an injunction restraining Progressive's future acts and practices.

55.    **Typicality.** The claims of the Plaintiff, who is the representative of the Class herein, are typical of the claims of the proposed Class, in that the claims of all members of the proposed Class, including the Plaintiff, depend on a showing of the acts of Defendant giving rise to the right of Plaintiff to the relief sought herein. There is no conflict between the individually named Plaintiff and the other members of the proposed Class with respect to this action, or with respect to the claims for relief set forth herein.

56.    **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the other Class members whom she seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, including successfully litigating class action cases similar to this one, where insurers breached contracts with insureds. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

57.    **Superiority.** A class action is superior to any other available means for

the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, such that it would be impracticable for the members of the Class to individually seek redress for Defendant's wrongful conduct. Even if the members of the Class could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT 1
## BREACH OF CONTRACT

58.    Plaintiff repeats and re-alleges all previously alleged paragraphs as if fully alleged herein.

59.    This Count is asserted by the Plaintiff on behalf of the Class.

60.    Plaintiff and each of the other Class members were insured under a policy issued by Defendant, as described herein.

61.    Plaintiff and each of the other Class members made claims under their insurance contracts, which Defendant determined to be first-party total losses under

the insurance contract, and additionally determined to be covered claims.

62.    Pursuant to the above-described contractual provisions, upon the total loss of their insured vehicles, Defendant purported to pay Plaintiff and each of the other Class members the ACV of their totaled vehicles.

63.    Defendant, however, failed to pay the ACV of Plaintiff's and Class members' vehicles because Defendant applied an arbitrary and capricious Projected Sold Adjustment to comparable vehicles in order to reduce their market value and, as a result, Defendant's total-loss payments to insureds.

64.    Defendant also failed to comply with Georgia law, which requires insurers to use one of the following four methods to determine "the actual cost less any deductible provided in the policy, to purchase a comparable automobile[:]" "1. The cost of two or more comparable automobiles in the local market area…"; "2. "The cost of two (2) or more comparable automobiles in areas proximate to the local market area…"; "3. One of two or more quotations obtained by the insurer from two or more licensed dealers located within the local market area… when the cost of comparable automobiles are not available in subparagraphs (a)1. and 2. Above[]"; "4. Any source for determining statistically valid fair market values that meet all of the following criteria which may be in electronic or printed format: (i) The source shall give primary consideration to the values of vehicles in the local market area, or may consider data on vehicles outside the area when comparable vehicles have not been available for data collection in the local market area. (ii) The source's database

shall produce values for at least 85% of all makes and models for at least the last fifteen (15) model years, taking into account the values of all major options for such vehicles. (iii) The source shall produce fair market values based on current data available from the area surrounding the location where the insured vehicle was principally garaged or a necessary expansion of parameters (such as time and area) to assure statistical validity." Georgia Rules and Regulations Rule 120-2-52-.06.

65.    Thus, Defendant failed to pay Plaintiff and each of the other Class members the promised ACV of their total-loss vehicles and thereby breached its contracts with Plaintiff and each of the other Class members.

66.    As a result of such contractual breaches, Plaintiff and each of the other Class members have been damaged and are entitled to recover damages, as well as costs, pre-judgment and post-judgment interest, injunctive relief, and other relief as appropriate.

## COUNT 2
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

67.    Plaintiff repeats and re-alleges all previously alleged paragraphs, except those allegations made under the preceding Count, as if fully alleged herein.

68.    This Count is asserted by the Plaintiff on behalf of the Class.

69.    Every contract, including the Policy, contains an implied covenant of good faith and fair dealing. The purpose of this duty is to ensure that parties do not take advantage of each other in a way that could not have been contemplated at the

time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract.

70.     Disputes involving the exercise of good faith arise when one party is given broad discretion in performing its obligations under the contract. Where a contract specifically vests one of the parties with broad discretion in performing a term of the contract, the covenant of good faith and fair dealing requires that the discretion be exercised reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.

71.     Under the Policy, Defendant had discretion to perform its obligations under the contract, including the obligation to determine the ACV of an insured's total-loss vehicle. Defendant, however exercised its discretion unreasonably, with an improper motive, and in a manner that was arbitrary, capricious, and inconsistent with the reasonable expectations of the parties, specifically, to arbitrarily reduce the amount of its total-loss payments to insureds, as alleged herein.

72.     Defendant also failed to comply with Georgia law, which requires insurers to use one of the following four methods to determine "the actual cost less any deductible provided in the policy, to purchase a comparable automobile[:]" "1. The cost of two or more comparable automobiles in the local market area…"; "2. "The cost of two (2) or more comparable automobiles in areas proximate to the local market area…"; "3. One of two or more quotations obtained by the insurer from two

or more licensed dealers located within the local market area… when the cost of comparable automobiles are not available in subparagraphs (a)1. and 2. Above[]"; "4. Any source for determining statistically valid fair market values that meet all of the following criteria which may be in electronic or printed format: (i) The source shall give primary consideration to the values of vehicles in the local market area, or may consider data on vehicles outside the area when comparable vehicles have not been available for data collection in the local market area. (ii) The source's database shall produce values for at least 85% of all makes and models for at least the last fifteen (15) model years, taking into account the values of all major options for such vehicles. (iii) The source shall produce fair market values based on current data available from the area surrounding the location where the insured vehicle was principally garaged or a necessary expansion of parameters (such as time and area) to assure statistical validity." Georgia Rules and Regulations Rule 120-2-52-.06.

73.    Defendant's breaches of the covenant of good faith and fair dealing have caused damages to Plaintiff and the Class. Plaintiff's and the Class members' damages include the amounts improperly deducted by Defendant from its payments to insureds on the basis of a Projected Sold Adjustment.

## COUNT 3
## UNJUST ENRICHMENT

74.    Plaintiff repeats and re-alleges all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

75.    This Count is asserted by the Plaintiff on behalf of the Class.

76.    Plaintiff pleads this claim separately as well as in the alternative to her other claims, as without such claims she would have no adequate legal remedy.

77.    Defendant requested and received a monetary benefit at the expense of Plaintiff and Class members in the form of premium payments for automobile insurance coverage.

78.    Defendant misrepresented, omitted, concealed, and/or failed to disclose material facts regarding its purported payment of ACV in the event of a total loss, specifically Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles to artificially reduce its total-loss payments to insureds.

79.    Defendant also failed to comply with Georgia law, which requires insurers to use one of the following four methods to determine "the actual cost less any deductible provided in the policy, to purchase a comparable automobile[:]" "1. The cost of two or more comparable automobiles in the local market area…"; "2. "The cost of two (2) or more comparable automobiles in areas proximate to the local market area…"; "3. One of two or more quotations obtained by the insurer from two or more licensed dealers located within the local market area… when the cost of comparable automobiles are not available in subparagraphs (a)1. and 2. Above[]"; "4. Any source for determining statistically valid fair market values that meet all of the following criteria which may be in electronic or printed format: (i) The source shall give primary consideration to the values of vehicles in the local market area, or

may consider data on vehicles outside the area when comparable vehicles have not been available for data collection in the local market area. (ii) The source's database shall produce values for at least 85% of all makes and models for at least the last fifteen (15) model years, taking into account the values of all major options for such vehicles. (iii) The source shall produce fair market values based on current data available from the area surrounding the location where the insured vehicle was principally garaged or a necessary expansion of parameters (such as time and area) to assure statistical validity." Georgia Rules and Regulations Rule 120-2-52-.06.

80.    If Defendant had not misrepresented, omitted, concealed, and/or failed to disclose material facts regarding its purported payment of ACV in the event of a total loss, specifically Defendant's application of an arbitrary Projected Sold Adjustment to comparable vehicles to artificially reduce its total-loss payments to insureds and its failure to comply with Georgia law, Plaintiff and the Class members either would not have purchased insurance through Defendant, or they would have paid less for such insurance coverage.

81.    Accordingly, Defendant was unjustly enriched by the premiums paid by Plaintiff and the Class members to the detriment of Plaintiff and the Class members.

82.    Plaintiff and the Class members are, thus, entitled to restitution and disgorgement in the amount Defendant was unjustly enriched, in an amount to be determined at trial.

## COUNT 4
## DECLARATORY JUDGMENT

83.    Plaintiff repeats and re-alleges all previously alleged paragraphs, except those allegations made under the preceding Counts, as if fully alleged herein.

84.    This Count is asserted by the Plaintiff on behalf of the Class.

85.    A dispute between Plaintiff and the Class and Defendant is before this Court concerning the construction of the auto insurance policies issued by Defendant, and the rights of Plaintiff and the Class arising under that policy.

86.    Plaintiff, individually and on behalf of the Class, seeks a declaration of rights and liabilities of the parties herein. Specifically, Plaintiff seeks a declaration that in paying total-loss claims by first-party insureds, it is a breach of Defendant's insurance contract for Defendant to base the valuation and payment of claims on values of comparable vehicles that have been reduced by arbitrary Projected Sold Adjustment that are (a) arbitrary, and (b) contrary to industry practices and consumer experiences (and therefore not reflective of the vehicle's fair market value).

87.    Defendant's common policy and general business practice as described herein are ongoing. Accordingly, Defendant has breached, and continues to breach, the express terms of its contracts of insurance with Plaintiff and members of the Class.

88.    As a result of these breaches of contract, Plaintiff and the Class members have been injured.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully seek judgement in Plaintiff's favor and in favor of the Class as follows:

A. An Order certifying this action as a Class Action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B. An award of damages (including actual, compensatory, statutory, and punitive, as provided by law) and restitution to Plaintiff and the Class in an amount to be determined at trial, plus interest, in accordance with law;

C. Appropriate preliminary and/or final injunctive or equitable relief against the conduct of Defendant's described herein;

D. An award of Plaintiff's and the Class' costs of suit, including reasonable attorneys' fees as provided by law; and

E. An award such further and additional relief as is necessary to redress the harm caused by Defendant's unlawful conduct and as the Court may deem just and proper under the circumstances.

Dated: June 8, 2022

Respectfully submitted,

**SHAMIS & GENTILE, P.A.**
<u>*/s/ Andrew J. Shamis*</u>
Andrew J. Shamis, Esq.
Georgia Bar No. 494196
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 705
Miami, Florida 33132
Telephone: 305-479-2299

***Counsel for Plaintiff and the Proposed Class***